**EXHIBIT A**

**Execution Version**

LIMITED LIABILITY COMPANY AGREEMENT

OF

BGN TECH LLC

Dated as of February 21, 2014

## TABLE OF CONTENTS

Page

ARTICLE I Definitions ........................................................................................................1
Section 1.01   Definitions ...........................................................................................1
Section 1.02   Table of Defined Terms .....................................................................11
Section 1.03   Construction .......................................................................................13

ARTICLE II Organization .................................................................................................14
Section 2.01   Formation; Continuation ...................................................................14
Section 2.02   Name ..................................................................................................14
Section 2.03   Principal Office ..................................................................................14
Section 2.04   Registered Office and Registered Agent ...........................................15
Section 2.05   Purposes and Powers of the Company ...............................................15
Section 2.06   Fiscal Year .........................................................................................15
Section 2.07   Term ...................................................................................................15
Section 2.08   Limited Liability Company Agreement .............................................15

ARTICLE IV Members ......................................................................................................21
Section 4.01   Voting Rights of Members .................................................................21
Section 4.02   Meetings of Members .........................................................................21
Section 4.03   Proxies ...............................................................................................22
Section 4.04   Action of Members by Written Consent .............................................22
Section 4.05   Liability to Third Parties ...................................................................22
Section 4.06   Lack of Authority ...............................................................................22

ARTICLE V Distributions .................................................................................................22
Section 5.01   Distributions ......................................................................................22
Section 5.02   Tax Withholding .................................................................................23

ARTICLE VI Capital Accounts; Allocations of Profit and Loss .......................................24
Section 6.01   Capital Account ..................................................................................24

DOC#: US1:9013784V29

Section 6.02    Allocations ................................................................................ 24

ARTICLE VII Management and Governance ...................................................... 24
    Section 7.01    Management and Control of the Company ............................. 24
    Section 7.02    The Board ............................................................................... 25
    Section 7.03    Meetings of the Board ............................................................ 26
    Section 7.04    Committees of the Board ....................................................... 26
    Section 7.05    Quorum .................................................................................. 27
    Section 7.06    Voting; Proxies ...................................................................... 27
    Section 7.07    Procedural Matters of the Board ............................................ 27
    Section 7.08    Board Matters ........................................................................ 28
    Section 7.09    Matters Requiring Unanimous Consent of the Board ............ 28
    Section 7.10    Officers .................................................................................. 31
    Section 7.11    Annual Budget ....................................................................... 32
    Section 7.12    Actions of Subsidiaries .......................................................... 33
    Section 7.13    Insurance Matters .................................................................. 33
    Section 7.14    Intellectual Property Counsel ................................................ 33

ARTICLE VIII Transfers; Restrictions on Transfer ........................................... 33
    Section 8.01    General Restrictions ............................................................... 33
    Section 8.02    Permitted Transfers ............................................................... 33
    Section 8.03    Conditions to Transfers ......................................................... 34
    Section 8.04    Satisfactory Written Assignment Required ........................... 35
    Section 8.05    Effect of Permitted Transfer .................................................. 35
    Section 8.06    Right of First Offer ................................................................ 35
    Section 8.07    Tag-Along Rights ................................................................... 37
    Section 8.08    Company Sale ......................................................................... 39
    Section 8.09    Allocation of Consideration in Company Sale ...................... 40
    Section 8.10    Effect of a Transfer on Ancillary Agreements ...................... 40
    Section 8.11    Tolling .................................................................................... 40
    Section 8.12    Right of First Refusal for Company Products ....................... 40
    Section 8.13    Right of First Refusal on Manufacturing Company Products .... 41

ARTICLE IX Limitation on Liability and Indemnification ................................ 41
    Section 9.01    Limitation on Liability .......................................................... 41
    Section 9.02    Duty of Directors ................................................................... 42
    Section 9.03    Indemnification by the Company; Non-Exclusivity of Rights .... 42
    Section 9.04    Insurance ................................................................................ 43
    Section 9.05    Savings Clause ....................................................................... 43

ARTICLE X Books, Records, Reports, Accounts ............................................... 44
    Section 10.01 Records and Accounting ......................................................... 44
    Section 10.02 Member Reports ..................................................................... 45
    Section 10.03 Accounts ................................................................................. 45
    Section 10.04 Other Information ................................................................... 46

DOC#: US1:9013784V29

ARTICLE XI Other Opportunities ................................................................................................ 46
    Section 11.01  Other Opportunities ...................................................................................... 46

ARTICLE XII Confidentiality ...................................................................................................... 46
    Section 12.01  Confidentiality .............................................................................................. 46

ARTICLE XIII Termination, Dissolution and Liquidation ........................................................... 47
    Section 13.01  Dissolution .................................................................................................... 47
    Section 13.02  Winding Up ................................................................................................... 48
    Section 13.03  Liquidating Distribution ............................................................................... 48
    Section 13.04  Survival of Liabilities and Obligations ......................................................... 49
    Section 13.05  Claims of the Members ................................................................................. 49
    Section 13.06  Distributions in Kind .................................................................................... 49
    Section 13.07  Effect of Liquidation on Intellectual Property .............................................. 50
    Section 13.08  Cancellation of Certificate ........................................................................... 52

ARTICLE XIV General Provisions ............................................................................................... 52
    Section 14.01  Amendment or Modification ......................................................................... 52
    Section 14.02  Notices .......................................................................................................... 52
    Section 14.03  Public Announcements ................................................................................. 53
    Section 14.04  Enforcement of Company's Rights ............................................................... 53
    Section 14.05  Entire Agreement .......................................................................................... 54
    Section 14.06  Waiver ........................................................................................................... 54
    Section 14.07  Injunctive and Other Relief .......................................................................... 54
    Section 14.08  Dispute Resolution ....................................................................................... 54
    Section 14.09  Binding Effect .............................................................................................. 55
    Section 14.10  Governing Law; Waiver of Jury ................................................................... 55
    Section 14.11  Consent to Jurisdiction and Service of Process ............................................ 55
    Section 14.12  Severability ................................................................................................... 56
    Section 14.13  Further Assurances ....................................................................................... 56
    Section 14.14  No Third-Party Beneficiaries ....................................................................... 56
    Section 14.15  Waiver of Certain Rights .............................................................................. 56
    Section 14.16  Opt-out of Article 8 of the Uniform Commercial Code ................................ 56
    Section 14.17  Delivery by Facsimile ................................................................................... 56
    Section 14.18  Counterparts ................................................................................................. 56
    Section 14.19  No Presumption ............................................................................................ 56
    Section 14.20  Expenses ....................................................................................................... 57
    Section 14.21  Headings ....................................................................................................... 57

DOC#: US1:9013784V29



DOC#: US1:9013784V29

LIMITED LIABILITY COMPANY AGREEMENT
OF
BGN TECH LLC


This LIMITED LIABILITY COMPANY AGREEMENT (this "Agreement") of BGN TECH LLC (the "Company") is made and entered into as of February 21, 2014, by and among Givaudan SA, a company existing under the laws of Switzerland ("Givaudan"), and Phyto Tech Corp. d/b/a Blue California, a California corporation ("Blue Cal"), the Company and each Person who may hereafter be admitted as a Member in accordance with the terms of this Agreement.

WHEREAS, the Company was formed as a limited liability company pursuant to and in accordance with the Act by the filing of a certificate of formation (the "Certificate") with the Secretary of State of the State of Delaware on February 13, 2014;

WHEREAS, the Members wish to operate the Company for the purpose of developing, manufacturing, marketing and/or selling certain products;

WHEREAS, concurrently with the execution of this Agreement, Blue Cal is contributing to the Company the Blue Cal Initial Contributed IP (as defined below) pursuant to the terms and conditions of the Blue Cal Initial IP Contribution Agreement (as defined below); and

WHEREAS, concurrently with the execution of this Agreement, Givaudan is contributing to the Company ███████████████████████ in cash and (ii) the Givaudan Contributed IP (as defined below) pursuant to the terms and conditions of the Givaudan IP Contribution Agreement (as defined below).

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

## ARTICLE I

### Definitions

Section 1.01   Definitions.  Capitalized terms used in this Agreement and not otherwise defined herein shall have the respective meanings ascribed thereto in this Article I. Other terms may be defined elsewhere in the text of this Agreement and, unless otherwise indicated, shall have such meaning throughout this Agreement.

"Act" means the Delaware Limited Liability Company Act, 6 Del. C. §§ 18-101, et seq.

"Affiliate" of a Person means any Person that directly or indirectly controls, is controlled by, or is under common control with the Person in question, except that neither

Member nor any Affiliate of any Member shall be deemed to be an Affiliate of any other Member solely by virtue of the Member's Membership Interest.  The term "Affiliated" and similar variations shall have correlative meanings.  For purposes of this Agreement, "control" (including with correlative meanings, the terms "controlling," "controlled by" or "under common control with") as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

"Ancillary Agreements" means the Blue Cal Initial IP Contribution Agreement, the Blue Cal Second IP Contribution Agreement, the Givaudan IP Contribution Agreement, any Blue Cal Background Licensed IP License, any Blue Cal Future Licensed IP License and the Blue Cal Services Agreement.

"Assignee" means a Person to whom Membership Interests have been Transferred in accordance with Article VIII but who has not become a substituted Member in accordance with Section 8.03(a).

"Available Cash" means, as of any date, the amount of cash and cash equivalents which the Board deems available for distribution to the Members, taking into account all debts, liabilities, and obligations of the Company then due, including the Company's obligations with respect to Givaudan's Payment Claims and Blue Cal's Payment Claims, and working capital and other amounts which the Board deems necessary for the Company's business or to place into reserves for customary and usual expenditures or claims with respect to such business.

"Bankruptcy Event" means, with respect to any Person or its Controlling Affiliates: (i) such Person or any of its Controlling Affiliates makes an assignment for the benefit of creditors; (ii) such Person or any of its Controlling Affiliates files a voluntary petition in bankruptcy; (iii) such Person or any of its Controlling Affiliates is adjudged bankrupt or insolvent, or has entered against it an order for relief in any bankruptcy or insolvency proceeding; (iv) such Person or any of its Controlling Affiliates files a petition or answer seeking for itself any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any law; (v) such Person or any of its Controlling Affiliates files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against it in any proceeding of the foregoing nature; (vi) such Person or any of its Controlling Affiliates seeks, consents to or acquiesces in the appointment of a trustee, receiver or liquidator of such Member or all or any substantial part of its properties or (vii) one hundred and twenty (120) days after the commencement of any proceeding against such Person or any of its Controlling Affiliates seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any law, the proceeding has not been dismissed, or if within ninety (90) days after the appointment without its consent or acquiescence to the appointment of a trustee, receiver or liquidator of such Person or any of its Controlling Affiliates or of all or any substantial part of such Person's or its Controlling Affiliates' properties, the appointment is not vacated, stayed, or within ninety (90) days after the expiration of any such stay, the appointment is not vacated.

"Blue Cal Contributed IP" means



"Blue Cal Background Licensed IP" means any and all Intellectual Property owned by Blue Cal or its Affiliates (other than the Blue Cal Contributed IP and any Blue Cal Future Licensed IP), including the Intellectual Property set forth on Schedule G, that may be licensed to the Company on a worldwide, transferable, royalty-free, sublicensable, non-exclusive basis within the Field in accordance with the provisions of Section 3.08.



"Blue Cal Initial IP Contribution Agreement" means the agreement dated as of the date hereof entered into by and between Blue Cal and the Company, pursuant to which the Blue Cal Initial Contributed IP is assigned and contributed to the Company.

"Blue Cal's Payment Claims" means each of the payments, if any, required to be made to Blue Cal or its Affiliates by the Company under the Ancillary Agreements.

"Blue Cal Second IP Contribution Agreement" means the agreement that shall be entered into by and between Blue Cal and the Company, pursuant to which the Blue Cal Second Contributed IP is assigned and contributed to the Company.

DOC#: US1:9013784V29

"Blue Cal Services Agreement" means the agreement pursuant to which Blue Cal's obligations with respect to the research and development services that it shall provide to the Company in furtherance of the Company's purpose shall have been set forth as one of the conditions precedent for first Givaudan Milestone Payment which is provided in Schedule D-1.

"Business" means, to the extent permitted by law, (a) the business of developing, manufacturing, marketing and/or selling Company Products, (b) conducting the Company activities contemplated by this Agreement and the Ancillary Agreements and (c) conducting any other ancillary activities that are approved by the Board.

"Business Day" means any day that is not a Saturday, Sunday or other day on which banking institutions in Geneva, Switzerland, New York, New York or Los Angeles, California are authorized or required by law or executive order to close.

"Capital Contribution" means the contribution or deemed contribution in cash or property (including Intellectual Property) the capital of the Company made by or on behalf of a Member.

"Change of Control" means, with respect to any Person, (i) any change in the ownership of the equity securities of such Person if, immediately after giving effect thereto, any Person (or group of Persons acting in concert) other than such initial Person or its Affiliates will have the direct or indirect power to (A) elect a majority of the members of the board of directors (or similar governing body) or (B) direct or cause the direction of the management and policies of such initial Person and/or (ii) any sale or other disposition of all or substantially all of the assets of such initial Person (including by way of a merger or consolidation or through the sale of all or substantially all of the equity interests or assets of such Person's Subsidiaries) to another Person.

In the event of the occurrence of a Change of Control of any Member, the definitions of "Change of Control" and, if applicable, "Permitted Transferees" and, if applicable, Section 1.03(b) shall be modified appropriately by good faith agreement of the Members to reflect the new holders, direct and indirect, of the affected Membership Interests.

"Code" means the Internal Revenue Code of 1986.

"Commercially Exploit" means to make, have made, import, use, sell or offer for sale, including to research, develop, commercialize, register, submit for regulatory approval, promote or market.

"Common Units" means the common membership interests in the Company with the corresponding rights and obligations set forth herein.

"Company Products" means any products or other materials within the Field, directly or indirectly developed by the Company.

4

"Competitor" means any Person that directly or indirectly owns, operates, controls or manages any Person or business that develops, manufactures, distributes or sells any products or other materials that compete with Company Products anywhere in the world.

"Contributed IP" means, collectively, the Blue Cal Contributed IP and the Givaudan Contributed IP.

"Controlled Affiliate" means, with respect to any Person, any Affiliate of such Person that is directly or indirectly, through one or more intermediaries, controlled by such Person.

"Controlling Affiliate" means, with respect to any Person, any Affiliate of such Person that directly or indirectly, through one or more intermediaries, controls such Person.



"Covered Person" means a Member, Director, officer or Affiliate of any Member and any officers, directors, stockholders, partners, members, employees, representatives or agents of a Member or its Affiliates, or any Person who was, at the time of the act or omission in question, such a Person.

"Directors" means, collectively, the Givaudan Directors, the Blue Cal Directors and the CEO Director, and "Director" means any one of the foregoing and any individual appointed by a Member to manage the activities and affairs of the Company as a member of the Board pursuant to Article VII.

"Effective Date" means the date hereof.

"Excluded Securities" means the following equity securities of the Company or any of its Subsidiaries, as applicable:  (a) equity securities offered pursuant to a registration statement filed under the Securities Act; (b) equity securities issued to a third party that is not an Affiliate of the Company or any of the Members in consideration of the acquisition of another Person or business by the Company or any of its Subsidiaries, whether by merger, consolidation, amalgamation, recapitalization, exchange of shares or membership interests, the purchase of substantially all of the assets or otherwise; (c) equity securities issued or sold to

DOC#: US1:9013784V29

any consultant to, or officer, director or employee of, the Company or any of its Subsidiaries (other than Persons who are employees of (x) Givaudan or (y) Blue Cal pursuant to any compensation arrangement adopted by the Board from time to time, option plan or other plan for the benefit of officers, directors and employees of the Company or any of its Subsidiaries, and Units issued upon the exercise of such options or rights or otherwise issued pursuant to any such plan; (d) equity securities issued to the Company's equityholders upon any split of membership interests, dividend, combination or other similar event with respect to the Company's equity securities or upon the conversion of any equity security of the Company into another equity security in accordance with its terms; and (e) equity securities issued to any third party lender of the Company or any of its Subsidiaries, which is not an Affiliate of the Company or any of the Members, in connection with any debt financing approved by the Board.

"Fair Market Value" of any equity securities or other property, means (whether determined by the Board or Investment Bank) means the price at which such equity securities or other property would likely be sold in an arm's-length transaction between a willing and able buyer under no compulsion to buy and a willing and able seller under no compulsion to sell (without any discount for non-marketability, minority position or liquidity restrictions).





    "Funding Date" means, with respect to any Additional Capital Contribution, the date set forth in the applicable Funding Notice for funding such Additional Capital Contribution.



    "GAAP" means generally accepted accounting principles in the United States, as in effect from time to time, consistently applied.



    "Givaudan Contributed IP" means

DOC#: US1:9013784V29

"Givaudan IP Contribution Agreement" means the Givaudan Contribution Agreement, dated as of the date hereof, by and between Givaudan and the Company, pursuant to which Givaudan's equal and undivided interest in the Givaudan Contributed IP is assigned and contributed to the Company.

"Givaudan's Payment Claims" means each of the payments required to be made to Givaudan or its Affiliates by the Company under the Ancillary Agreements.

"Ingredient" means any component part of a mixture or a preparation.

"Initial Public Offering" means an underwritten public offering of any equity securities of the Company or any of its Subsidiaries pursuant to an effective registration statement under the Securities Act that results in the listing for trading on an internationally recognized securities exchange or inter dealer quotation system of any equity securities of the Company or any of its Subsidiaries offered in such public offering.

"Intellectual Property" means all worldwide (i) inventions whether or not patentable; (ii) patents and patent applications, together with all divisions, continuations, continuations-in-part, extensions and reexaminations thereof; (iii) trademarks, service marks, trade dress, logos, domain names and trade names, whether or not registered, and all goodwill associated therewith; (iv) copyrights, mask works and related rights, whether or not registered; (v) computer software, data, databases, files, and documentation and other materials related thereto; (vi) Trade Secrets, Know-How, confidential technical and business information, customer and supplier lists, and all personally-identifiable information; (vii) all other rights, of any nature, similar to the foregoing; and (ix) all rights to sue or recover and retain damages and costs and attorneys' fees for past, present and future infringement or misappropriation of any of the foregoing.

"Investment Bank" means an internationally recognized independent investment banking firm to be mutually agreed upon by the Members within thirty (30) days after any Member shall have requested that the Company engage an Investment Bank in connection with the determination of the Fair Market Value of any equity securities or other property of the Company; provided, however, that if the Members cannot agree upon an investment banking firm within such 30-day period, then the "Investment Bank" shall mean a third internationally recognized independent investment banking firm which shall be selected by two investment banking firms, one selected by each Member (each of which shall be selected by each Member within fifteen (15) days after the end of such initial thirty (30)-day period).

"Know-How" means any research information, technical information, technical data or other information, including all unpatented and/or unpatentable inventions, technology,

DOC#: US1:9013784V29

cell lines, microbes, microbial strains (*e.g.*, wild type or genetically engineered), molecules, either captive or in the course of production, biological material, compounds, probes, sequences and methodologies.



"Losses" means any and all losses, liabilities, damages, assessments, fines, judgments, costs and expenses, including reasonable attorney's fees.

"Material Breach" means, with respect to any Member, a material breach by such Member or its Affiliates of this Agreement or any Ancillary Agreement to which such Person is a party.

"Member" means Givaudan, Blue Cal and each Person who may hereafter be admitted as a Member in accordance with the terms of this Agreement.  The Members shall constitute the "members" (as that term is defined in the Act) of the Company.

"Membership Interest" means an ownership interest in the Company and includes any and all benefits to which the holder of such Membership Interest may be entitled as provided in this Agreement, together with all obligations of such Person to comply with the terms and provisions of this Agreement, and which may be expressed as a number of Units or as a Percentage Interest.



9

"Percentage Interest" with respect to any Member and any date of determination, means the percentage obtained by dividing (a) the total number of Units held by such Member by (b) the total number of Units outstanding, in each case as of such date.

"Permitted Transferee" has the meaning set forth in Section 8.02(a), subject to the last sentence in the definition of "Change of Control."

"Person" means an individual or a corporation, partnership, limited liability company, trust, unincorporated organization, association or any other entity.

"Securities Act" means the Securities Act of 1933.

"Subsidiary" of a Person means any other Person (i) as to which such Person has the power to elect a majority of the board of directors (or other board, body or Person that serves the function of a board of directors) of such other Person or (ii) which is included as a subsidiary in the consolidated financial statements of such Person in accordance with GAAP.

 all naturally occurring, synthetically-produced and biosynthetically-produced compounds, mixtures of compounds, Ingredients, molecules, compositions, raw materials, intermediates and related technologies (including components, delivery systems and methods of making anything related thereto) which increase, augment, intensify, accentuate or magnify the sensory perception of one or more sweetness characteristics of an orally consumable product without changing the nature or quality thereof as compared to a corresponding orally consumable product that does not contain such compound or Ingredient.

"Term" means the period commencing on the Effective Date and ending on the date a Company Sale is consummated or the Company is earlier dissolved and terminated in accordance with the provisions of Article XIII.

"Trade Secrets" means any and all technical and operational information, including product formulae, customer lists, marketing strategies, cost and price information, processes, management methods and production methods, in each case which is (i) not generally known to the public, (ii) which has economic value or provides a competitive advantage and/or (iii) which the owner has taken measures to keep secret.

"Transfer" means to transfer, sell, assign, convey, pledge, mortgage, encumber, hypothecate or otherwise dispose of all or any portion of the ownership interest or other rights in question, irrespective of whether any of the foregoing are effected voluntarily or involuntarily, directly or indirectly, by merger, sale of equity, operation of law or otherwise. The terms "Transferred," "Transferor," "Transferee" and similar variations shall have correlative meanings.

"United States" or "U.S." means the United States and its territories, possessions and commonwealths (including Puerto Rico, the United States Virgin Islands and Guam).

Section 1.02   Table of Defined Terms.

| Term | Section |
|------|---------|
| Additional Capital Contributions | 3.04(a) |
| Additional Units | 3.09(a) |
| Affected Member | 13.01(d) |
| Agreement | Preamble |
| Blue Cal | Preamble |
| Blue Cal Background Licensed IP License | 3.08(c) |
| Blue Cal Future Licensed IP License | 3.08(d) |
| Blue Cal Director | 7.02(a) |
| Board | 7.01 |
| CEO Director | 7.02(a) |
| Certificate | Recitals |
| Chairman | 7.07(c) |
| Chief Executive Officer | 7.11(a) |
| Company Sale | 8.08(a) |
| Company Sale Notice | 8.08(a) |
| Confidential Information | 12.01(a) |
| Consolidating Member | 10.02(b) |
| Company Developed IP | 3.08(b) |
| Exercise Notice | 8.06(b) |

11

| Term | Section |
| --- | --- |
| First Givaudan Milestone Capital Contribution | 3.02(b) |
| Fiscal Year | 2.06 |
| Funding Notice | 3.04(b) |
| Further Actions | 3.08(b) |
| Further IP Election Period | 13.07(b)(ii)(4) |
| Further IP Owner | 13.07(b)(ii)(4) |
| Givaudan | Preamble |
| Givaudan Director | 7.02(a) |
| Givaudan Milestone Capital Contributions | 3.02(c) |
| Independent IP Counsel | 7.14 |
| Initial Budget | 7.11(a) |
| Initial Capital Contributions | 3.02(a) |
| Initial Contribution | 3.02(a) |
| IP Arbitration Procedures | 3.08(c)(v) |
| IP Committee | 7.04(b) |
| Liquidator | 13.02 |
| Matching Notice | 8.06(c) |
| Members Schedule | 3.01(a) |
| Negotiation Period | 8.06(b) |
| Non-Affected Member | 13.01(d) |
| Notice of Acceptance | 3.09(c) |
| Offer Period | 3.09(b) |
| Offer Price | 8.06(c) |
| Offered Tag-Along Sale Units | 8.07(b) |
| Offered Units | 8.06(a) |
| Panel | 3.08(c)(i) |
| pdf file | 14.17 |
| Permitted Affiliate Transferee | 8.02(a) |
| Permitted Transfer | 8.02 |
| Permitted Transferee | 8.02 |
| Post-Termination License Agreement | 13.07(b)(ii) |
| Preemptive Offer | 3.09(b) |
| Preemptive Offer Notice | 3.09(b) |
| Product Manufacturing Agreement | 8.13 |
| Product Manufacturing Election Period | 8.13 |
| Product Purchase Agreements | 8.12 |
| Product Purchase Election Period | 8.12 |
| Proportionate Percentage | 3.09(a) |
| Proposed Further IP Licensee | 13.07(b)(ii)(4) |
| Proposed Further IP License Agreements | 13.07(b)(ii)(4) |
| Proposed Product Manufacturer | 8.13 |
| Proposed Product Purchaser | 8.12 |
| Proposed Purchaser | 8.07(a) |
| Proposed Seller | 8.07(a) |
| Purchaser | 8.08(a) |

DOC#: US1:9013784V29

| Term | Section |
|------|---------|
| Receiving Party | 12.01(b) |
| Related-Party Transaction | 7.09(u) |
| Requested Amount | 3.04(b) |
| Requisite Percentage | 8.07(c) |
| Resolution Representative | 14.08 |
| ROFO Exercise Period | 8.06(b) |
| ROFO Member | 8.06(a) |
| ROFR Exercise Period | 8.06(c) |
| Sale Proposal | 8.06(c) |
| Second Givaudan Milestone Capital Contribution | 3.02(c) |
| Selling Member | 8.06(a) |
| Significant Matters | 7.09 |
| Solicitation Period | 8.06(c) |
| Steering Committee | 7.04(a) |
| Tag-Along Members | 8.07(a) |
| Tag-Along Notice | 8.07(b) |
| Tag-Along Rights | 8.07(a) |
| Tag-Along Sale | 8.07(a) |
| Tag-Along Units | 8.07(c) |
| Third Party Purchaser | 8.06(c) |
| Third Party Transfer Notice | 8.06(c) |
| Transfer Notice | 8.06(a) |
| Unit Consideration | 3.01(b) |
| Withheld Amount | 5.02(b) |

Section 1.03   Construction.

(a)        For purposes of this Agreement, except as otherwise expressly provided herein or unless the context otherwise requires:  (i) words using the singular or plural number also include the plural or singular number, respectively, and the use of any gender herein shall be deemed to include the other genders; (ii) references herein to "Articles," "Sections," "subsections" and other subdivisions, and to Exhibits and other attachments, without reference to a document are to the specified Articles, Sections, subsections and other subdivisions of, and Exhibits and other attachments to, this Agreement; (iii) a reference to a subsection without further reference to a Section is a reference to such subsection as contained in the same Section in which the reference appears, and this rule shall also apply to other subdivisions within a Section or subsection; (iv) the words "herein," "hereof," "hereunder," "hereby" and other words of similar import refer to this Agreement as a whole and not to any particular provision; (v) the words "include," "includes" and "including" are deemed to be followed by the phrase "without limitation" (vi) with respect to the determination of any period of time, the word "from" means "from and including" and the words "to" and "until" each means "to but excluding"; (vii) reference to any law, rule or regulation means such law, rule or regulation as amended, modified, codified, replaced or reenacted, in whole or in part, and in effect from time to time, including all rules and regulations promulgated thereunder, and reference to any section or other provision of any law, rule or regulation means that provision of such law, rule or regulation from time to time

DOC#: US1:9013784V29

in effect and constituting the substantive amendment, modification, codification, replacement or reenactment of such section or other provision; (viii) the word "Dollars" or "$" means Dollars of the United States of America; and (ix) if the last day for the giving of any notice or the performance of any act required or permitted under this Agreement is a day that is not a Business Day, then the time for the giving of such notice or the performance of such action shall be extended to the next succeeding Business Day.  Whenever this Agreement refers to a number of days, such number shall refer to calendar days unless Business Days are specified.

(b)        Unless the context otherwise requires, if a Member directly Transfers a portion (but not all) of its Membership Interest to a Permitted Affiliate Transferee and the Permitted Affiliate Transferee is admitted as a Member:  (i) such initial Member and Permitted Affiliate Transferee shall (A) be grouped together and considered a single Member, (B) act collectively and (C) be represented by such initial Member, who shall have the authority to represent and bind such Permitted Affiliate Transferee and to receive and provide all notices on its behalf; (ii) with respect to Givaudan, any references to Member or Givaudan shall collectively refer to Givaudan and such Permitted Affiliate Transferee; and (iii) with respect to Blue Cal, any references to a Member or Blue Cal shall collectively refer to Blue Cal and such Permitted Affiliate Transferee.

(c)        Unless the context otherwise requires, if a Member Transfers its entire Membership Interest in accordance with Article VIII and the Transferee is admitted to the Company as a substituted Member pursuant to Section 8.03(a), references to Member, Blue Cal or Givaudan, as applicable, in this Agreement shall mean such substituted Member, and such substituted Member shall be considered the initial Member for purposes of Section 1.03(b).

(d)        For the avoidance of doubt, the terms of construction set forth in Sections 1.03(b) and (c) shall be fully applicable (except where they are not applicable by their terms above) whether or not a particular provision of this Agreement includes or does not include a specific reference to "Permitted Transferee."

(e)        For purposes of this Agreement, any reference to a defined term in or provision of any Ancillary Agreement that shall have been terminated as of any date of determination shall, to the extent consistent with the substantive effect of such termination, be deemed to be a reference to such defined term or provision as in effect immediately prior to the termination of such Ancillary Agreement.

(f)        For the purposes of this Agreement, although the Company would be an Affiliate and Controlled Affiliate of each of Givaudan and Blue Cal, the Parties have agreed that the Company shall not be treated as such for the purposes of this Agreement or any of the Ancillary Agreements.

DOC#: US1:9013784V29

# ARTICLE II

## Organization

Section 2.01   Formation; Continuation.   The Company was formed on February 13, 2014 pursuant to the provisions of the Act, upon the filing of the Certificate.  Each Member hereby agrees that the Company shall be governed by, and the rights, duties and liabilities of the Members shall be as provided in, the Act and this Agreement; provided, however, that in the event of any inconsistencies in the rights and obligations of the Members under the Act and this Agreement, then to the maximum extent permitted by law, the terms of this Agreement shall control.

Section 2.02   Name.   The name of the Company is BGN TECH LLC  The Business may be conducted in the name of the Company or such other names that comply with applicable law as the Board may select from time to time, subject to compliance with the Ancillary Agreements.

Section 2.03   Principal Office.   The principal office of the Company is at 30111 Tomas, Rancho Santa Margarita, CA 92688, USA, or at such other location as may be selected from time to time by the Board.  The Company shall keep its books and records at its principal office.  The Board shall give prompt notice to each Member of any change in the location of the Company's principal office.

Section 2.04   Registered Office and Registered Agent.   The street address of the registered office of the Company in the State of Delaware is at 615 South DuPont Highway, Dover, County of Kent, Delaware 19901 or such other place in the State of Delaware as may from time to time be designated by the Board in accordance with the Act, and the Company's registered agent at such address is National Corporate Research, Ltd.

Section 2.05   Purposes and Powers of the Company.

(a)        The purpose of the Company is to (i) conduct, to the extent permitted by law, the Business, engaging, in particular, in developing, manufacturing, marketing and/or selling certain products, (ii) engage in any and all businesses and activities directly related, incidental or ancillary thereto and (iii) carry on any lawful business, purpose or activity permitted under the Act.

(b)        The Company shall have the power to do any and all acts reasonably necessary, appropriate, proper, advisable, incidental or convenient to or for the furtherance of the purposes and the Business described herein and for the protection and benefit of the Company, and shall have, without limitation, any and all of the powers that may be exercised on behalf of the Company by the Board pursuant to this Agreement.

Section 2.06   Fiscal Year.   The fiscal year of the Company shall end on December 31 of each year (the "Fiscal Year"), and shall be the same for Company accounting and federal income tax purposes unless otherwise required by the Code.  The Fiscal Year of the Company may be changed by the Board.

DOC#: US1:9013784V29

Section 2.07   Term.   The Company commenced on the date the Certificate was filed pursuant to the Act and shall exist perpetually unless earlier dissolved and terminated in accordance with the provisions of Article XIII.

Section 2.08   Limited Liability Company Agreement.   Each Member hereby executes this Agreement for the purpose of establishing the affairs of the Company and the conduct of its Business in accordance with the provisions of the Act.   Each Member acknowledges that, during the Term, the rights and obligations of the Members with respect to the Company shall be determined in accordance with the Act and the terms and conditions of this Agreement; provided, that to the extent that the rights and obligations of either Member are different by reason of any provision of this Agreement than they would be in the absence of such provision, this Agreement shall, to the extent permitted by the Act, control.



DOC#: US1:9013784V29



DOC#: US1:9013784V29



18



19

DOC#: US1:9013784V29



DOC#: US1:9013784V29



## ARTICLE IV

### **Members**

Section 4.01   <u>Voting Rights of Members</u>.  Members shall not be entitled to vote with respect to any matters (other than the Member Approved Matters) except as required by non-waivable provisions of applicable law or this Agreement.  All holders of Common Units shall vote as a single class upon all matters upon which Members are entitled to vote under this Agreement or under the Act.  On all matters submitted to a vote of the Members, each holder of Common Units shall be entitled to one (1) vote for each Common Unit held by such holder; <u>provided</u>, that for purposes of this sentence, any fraction of a Unit shall be rounded up to the nearest whole Unit if such fraction is equal to or greater than 0.5 and rounded down to the nearest whole Unit if such fraction is less than 0.5.  This provision is in addition to, and does not affect, any provision of this Agreement or any Ancillary Agreement

21

that requires the consent or approval of a Member with respect to a particular matter.  Any action required or permitted to be taken by the Members hereunder or under the Act shall be taken in accordance with this Article IV.

Section 4.02    Meetings of Members.

(a)        Meetings of the Members shall be held at such times as the Board shall from time to time determine or as otherwise required by law.  Written notice shall be given to each Member of each meeting of the Members either personally, by facsimile or by electronic mail, which notice shall state the place, date, time and purpose of such meeting. Notice of any meeting need not be given to any Member who shall agree in writing, either before or after such meeting, to a waiver of notice.  Attendance of a Member at a meeting shall constitute a waiver of notice of such meeting, except when the Member attends the meeting for the express purpose of objecting at the beginning thereof to the transaction of any business because the meeting is not properly called or convened.

(b)        The Members may hold meetings at the Company's principal place of business or such other place as the Board may designate.

(c)        Members may participate in a meeting of the Members by conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear one another (including by video conference) and such participation shall constitute presence in person at such meeting.

(d)        The Members shall appoint the Person (who shall be an agent or other representative of a Member present at such meeting) to preside over each meeting of the Members.  The secretary of the Company shall act as secretary at each meeting of the Members.  In case the secretary shall be absent from any meeting of the Members, any assistant secretary of the Company shall perform the duties of secretary at such meeting or the person presiding at the meeting may appoint any Person to act as secretary of the meeting.

(e)        A quorum of any meeting of the Members shall require the presence (by telephone or otherwise) of both Members.  No action at any meeting may be taken by the Members unless a quorum is present.  No action may be taken by the Members at any meeting at which a quorum is present without mutual agreement of Blue Cal and Givaudan.  If the Members become deadlocked with respect to the approval of any proposed matter within the authority of the Members, such matter shall be resolved in accordance with the dispute resolution procedures set forth in Section 14.08.

Section 4.03    Proxies.  A Member may vote either in person, via conference telephone or similar communications equipment, or by proxy executed in writing by such Member.  A facsimile or similar transmission by any Member (including a facsimile delivered by electronic mail), or a photographic, photostatic or similar reproduction of a writing executed by such Member shall be treated as an execution in writing for purposes of this Section 4.03.  A proxy shall be revocable unless the proxy form conspicuously states that the proxy is irrevocable.

Section 4.04   <u>Action of Members by Written Consent</u>.  Any action required or permitted to be taken at any meeting of the Members may be taken without a meeting, without prior notice, and without a vote, if a consent in writing, setting forth the action so taken, shall be signed by all of the Members and the consent is filed with the minutes of the proceedings of the Members.

Section 4.05   <u>Liability to Third Parties</u>.  No Member, Director or officer shall be liable for the debts, obligations or liabilities of the Company in their capacity as such.

Section 4.06   <u>Lack of Authority</u>.  Except as specifically provided herein, none of the Members, in such capacity, shall have the authority or power to act for or on behalf of the Company, to do any act that would be binding on the Company, or to incur any obligations or liabilities on behalf of the Company.

**ARTICLE V**

**Distributions**

Section 5.01   <u>Distributions</u>.

(a)      Subject to <u>Section 5.02</u>, the Company shall make distributions of Available Cash to the Members at such times and in such amounts as the Board may determine from time to time in its sole discretion.  Except as otherwise specifically provided in <u>Section 8.09</u>, distributions shall be made to all Members in proportion to their Percentage Interests.

(b)      Distributions to each Member pursuant to this Agreement shall be made pursuant to payment instructions specified by each such Member by notice given to the Company pursuant to <u>Section 14.02</u>.

Section 5.02   <u>Tax Withholding</u>.

(a)      Notwithstanding any other provision of this Agreement, each Member authorizes the Company to withhold and to pay over, or otherwise pay, any withholding or other taxes payable by the Company or any of its Affiliates (pursuant to the Code or any provision of the United States Federal, state, local or foreign tax law) with respect to such Member or as a result of such Member's participation in the Company; and if and to the extent that the Company shall be required to withhold or pay and actually pays any such withholding or other taxes, such Member shall be deemed for all purposes of this Agreement to have received a payment from the Company as of the time such withholding or other tax is paid, which payment shall be deemed to be a distribution made pursuant to <u>Section 5.01</u> with respect to such Member's interest in the Company.  To the extent that such deemed distribution to such Member (or any successor to such Member) for any tax period exceeds the distributions that such Member would have received for such period but for such withholding, such excess shall be treated as an interest-free advance to such Member. Amounts so treated as advanced to any Member shall be repaid by such Member to the Company within thirty (30) days after the Company delivers a written request to such Member

DOC#: US1:9013784V29

for such repayment; provided, however, that if any such repayment is not made, the Company may (without prejudice to any other rights of the Company) collect such unpaid amounts from any subsequent Company distributions that otherwise would be made to such Member.

(b) If the Company makes a distribution in kind (if such distribution is permitted in accordance with the terms of this Agreement) and such distribution is subject to withholding or other taxes payable by the Company on behalf of any Member (the "Withheld Amount"), the Company shall notify such Member as to the extent (if any) of the Withheld Amount and such Member shall make a prompt payment to the Company of the Withheld Amount by wire transfer (it being understood that, notwithstanding anything else herein to the contrary, the Company shall refrain from distributing such property to be distributed having a Fair Market Value of at least the Withheld Amount until the Company has received a payment of such Withheld Amount).

(c) Any withholding referred to in this Section 5.02 shall be made at the maximum applicable statutory rate under the applicable tax law unless the Company shall have received an opinion of counsel or other evidence, reasonably satisfactory to the Company, to the effect that a lower rate is applicable, or that no withholding is applicable.

(d) If the Company receives a distribution from or in respect of which tax has been withheld, the Company shall be treated as having received cash in an amount equal to the amount of such withheld tax, and each Member shall be treated as having received as a distribution in accordance with Section 5.01.

## ARTICLE VI

### Capital Accounts; Allocations of Profit and Loss

Section 6.01   Capital Account.

(a) The Company shall establish a separate Capital Account for each Member.  Capital Accounts shall consist of such Member's initial Capital Contribution to the Company, (i) increased by (A) any additional actual or constructive capital contributions by such Member to the Company and (B) any income from time to time credited to the Capital Account of such Member pursuant to Article VI, and (ii) decreased by (A) any actual or constructive distributions to such Member and (B) any losses or deductions from time to time charged to the Capital Account of such Member pursuant to Article VI.

(b) For purposes of maintaining and determining Capital Accounts, all property distributed in kind by the Company to a Member shall be charged to that Member's Capital Account at the Fair Market Value of such property on the date of distribution, and all property contributed in kind by a Member to the Company shall be credited to that Member's Capital Account at the Fair Market Value of such property on the date of contribution.

DOC#: US1:9013784V29

(c)        If all or a portion of a Membership Interest is Transferred in accordance with the terms of this Agreement, the assignee shall succeed to the Capital Account of the assignor to the extent that it relates to such Membership Interest.

(d)        Except as expressly required by the Act, no Member shall have any obligation to restore a deficit balance in its Capital Account.

Section 6.02   Allocations.  Except as otherwise provided in this Agreement, net profit and net loss (and, to the extent necessary, individual items thereof) of the Company shall be allocated among the Members in a manner that reflects their economic interest in the Company, as reasonably determined by the Board.

**ARTICLE VII**

**Management and Governance**

Section 7.01   Management and Control of the Company.  Except for those matters for which the approval or consent of any Member is required by this Agreement, any Ancillary Agreement or by non-waivable provisions of applicable law, the business and affairs of the Company and any Subsidiary of the Company shall be managed by the Members acting through a Board of Directors (the "Board"), and the Board shall have, subject to the terms of this Agreement and the Ancillary Agreements, full, exclusive and complete discretion, power and authority to manage, control, administer and operate the business and affairs of the Company and its Subsidiaries.  Decisions of the Board within its scope of authority shall be binding upon the Company and its Members (in their capacity as Members).

Section 7.02   The Board.

(a)        The size of the Board shall, as of the Effective Date, be set at five (5) members, which shall, subject to the provisions of Section 7.02(b), be comprised of (i) two (2) members designated by Givaudan (each a "Givaudan Director"), (ii) two (2) members designated by Blue Cal (each an "Blue Cal Director") and (iii) the individual then serving as the Chief Executive Officer, it being understood that so long as the Company has a Chief Executive Officer, the Person who at such time is the Chief Executive Officer shall be a member of the Board (the "CEO Director").  The initial Board as of the Effective Date shall be as set forth on Schedule B attached hereto, provided, that the size of the Board may be changed as the Board may, from time to time, determine.  The Members hereby agree to vote their Units and take any and all additional actions necessary to effect the provisions of this Section 7.02.

(b)        Notwithstanding the foregoing provisions of Section 7.02(a), if as of any date, a Member (together with any of its Permitted Transferee Affiliates) ceases to own a Percentage Interest of at least (i) 33.33%, then effective as of such date, such Member shall be entitled to designate one member of the Board only, and the other Director(s) previously designated by such Member (as selected by such Member) shall be automatically removed from the Board, and the other Member (to the extent that it holds a Percentage Interest of at least 49%) shall have the right to designate the individual(s) who will be

appointed to the Board to replace such removed individual(s), and (ii) 10%, then effective as of such date, such Member shall not be entitled to designate any member of the Board, and the Director(s) previously designated by such Member shall be automatically removed from the Board, and the other Member (to the extent that it holds a Percentage Interest of at least 33.33%) shall have the right to designate the individual(s) who will be appointed to the Board to replace such removed individuals.

(c)       Each Givaudan Director shall serve until such Director's successor is designated by Givaudan, or, if earlier, until such Director's death, resignation or removal by Givaudan.  Each Blue Cal Director shall serve until such Director's successor is designated by Blue Cal, or, if earlier, until such Director's death, resignation or removal by Blue Cal.  Except as provided in Section 7.02(b), a vacancy on the Board because of death, resignation, or removal or any other cause shall be filled upon the direction of, and as designated by, the Person that appointed such Director, and to the extent requested by the Person entitled to fill a vacancy, each Member shall promptly take such actions and deliver all such documents and instruments requested so as to effect the filling of such vacancy.  The CEO Director shall serve until such Person no longer serves as the Chief Executive Officer of the Company (whether by death, resignation, replacement or removal), and such vacancy shall be filled by the subsequent Chief Executive Officer of the Company or such other Person as mutually agreed to by Blue Cal and Givaudan.

(d)       Any Director may resign at any time by so notifying the secretary of the Company in writing.  Such resignation shall take effect upon receipt of such notice by the secretary of the Company or at such later time as is therein specified, and unless otherwise specified, the acceptance of such resignation shall not be necessary to make it effective.  Any Givaudan Director or Blue Cal Director may be removed, with or without cause, by the Person who designated such Director to the Board by written notice to the Company, Givaudan and Blue Cal.

Section 7.03   Meetings of the Board.

(a)       The Board shall hold a regular meeting at least once per year at such time and place as shall be determined by the Board, either in person or by means of telephone or other communications facility that permits all persons participating in the meeting to hear each other (including via video conference), at the offices of the Company or such other place as may be agreed from time to time by the Board (unless such meeting shall be waived by a writing signed by all the Directors).

(b)       Each Member may designate observers to attend any meeting of the Board or any committee (provided, that any such observer shall be an employee of such Member (or its Controlled Affiliate) who is familiar with the Business of the Company as a result of such employment), and the Company shall provide each such observer with the same financial and other information that is provided to Directors in connection with such meeting; provided, that no such observer shall be counted for the purpose of determining a quorum for the transaction of business by the Board or committee, nor shall any such observer be permitted to vote on any matter considered by the Board or committee at such meeting; and provided, further that the Company reserves the right to

DOC#: US1:9013784V29

withhold any information and to exclude any such observer from any meeting if access to such information or attendance at such meeting could adversely affect the attorney-client privilege between the Company and its legal counsel.

Section 7.04   Committees of the Board.

(a)      Subject to Section 7.09, the Board may establish one or more additional committees as it deems necessary or appropriate from time to time.  Each such committee shall consist of a number of persons designated by each of Givaudan and Blue Cal that is proportionate to such party's representation on the Board (or as close thereto as practicable), except as otherwise agreed to, in writing, by Givaudan and Blue Cal.  Subject to Section 7.09, any action by a committee of the Board shall require the affirmative vote of a majority of the persons on such committee and each such committee shall exercise those powers of the Board delegated to it by the Board.  Any committee established by the Board shall meet on a regular basis with such frequency as is customary for such committees.

(b)      The Board shall establish (i) a steering committee (the "Steering Committee"), which, subject Section 7.09, shall be responsible for the management of the day-to-day operations of the Company and (ii) an intellectual property advisory committee (the "IP Committee"), which, subject Section 7.09, shall be responsible for (A) the selection of the Independent IP Counsel and providing guidance to the Board on all matters relating to Company Developed IP, the Blue Cal Contributed IP and the Givaudan Contributed IP, including freedom to operate, trade secret identification and protection, invention disclosure, drafting, filing, prosecution and maintenance strategies.  The members of the Steering Committee and the IP Committee are set forth on Schedule B hereto.

Section 7.05   Quorum.  No action may be taken at a meeting of the Board (or any committee thereof) unless at least one (1) Blue Cal Director and at least one (1) Givaudan Director are present; provided, however, that if at any time there is not at least one (1) Blue Cal Director and at least one (1) Givaudan Director present at any meeting properly called pursuant to Section 7.03, such meeting shall be adjourned to a later date and notice of such adjournment shall be given to each of the Directors pursuant to Section 7.03.  If any such meeting is adjourned by reason of the proviso to the immediately preceding sentence, then the presence of at least one (1) Blue Cal Director or at least one (1) Givaudan Director shall be required for the Board to take any action at such adjourned meeting.

Section 7.06   Voting; Proxies.  Except as otherwise provided herein, the Board shall act by the affirmative vote of a majority of the Directors present (it being understood that a Director having issued a proxy is deemed to be present).  Each Director shall have one vote. Each Director is entitled to appoint one or more representatives (each of whom shall be required  to be a Director or an executive officer of the Member that designated the Director proposing to appoint such representative) to act for such Director at any meeting of the Board by executing a written proxy.  A proxy is sufficient if signed by such Director, but a signed written proxy shall not be necessary for a Blue Cal Director to vote on behalf of any other Director appointed by Blue Cal who is not present at any such meeting or for a Givaudan

Director to vote on behalf of any other Director appointed by Givaudan who is not present at any such meeting.

Section 7.07    Procedural Matters of the Board.

(a)        Any action required or permitted to be taken at any meeting of the Board may be taken without a meeting and without prior notice if a consent in writing setting forth the actions so taken is signed by a majority of the Directors, including at least one (1) Givaudan Director and one (1) Blue Cal Director.  A written consent delivered pursuant to this Section 7.07(a) shall be filed with the minutes of the proceedings of the Board.

(b)        The Board shall cause to be kept a book of minutes of all of its meetings and actions by written consent and in which there shall be recorded with respect to each meeting of the Board the time and place of such meeting, whether regular or special (and if special, how called), the names of those present and the proceedings thereof.

(c)        The chairman of the Board (the "Chairman") shall be selected by the affirmative vote or written consent of a majority of the Directors and shall serve in such capacity until his or her earlier death, resignation or removal, or the appointment of his or her successor.  The Chairman shall preside over each meeting of the Board, or, if the Chairman is unable to attend or participate in such meeting, a majority of the Directors present shall appoint any member of the Board to preside at such meeting.  The secretary of the Company shall act as secretary at each meeting of the Board.  In case the secretary shall be absent from any meeting of the Board, any assistant secretary of the Company shall perform the duties of secretary at such meeting or the individual presiding at the meeting may appoint any Person to act as secretary of the meeting.

(d)        The Company shall promptly reimburse, in accordance with Company policy in effect from time to time each Director who is not an employee of the Company or any of its Subsidiaries for all of his or her documented out-of-pocket expenses reasonably incurred in attending each meeting of the Board or any committee thereof.

Section 7.08    Board Matters.  Without limiting the generality of the authority of the Board set forth in Section 7.01, but subject in all respects to the provisions of Section 7.09, the Board is hereby authorized as follows:

(a)        to conduct the Business, carry on its operations and have and exercise the powers granted to a limited liability company by the Act in any state, territory, district or possession of the United States, or in any foreign country that may be necessary, convenient or incidental to the accomplishment of the purposes of the Company;

(b)        to acquire by purchase, lease, contribution of property or otherwise, own, hold, operate, maintain, finance, improve, lease, sell, convey, mortgage, transfer, demolish or dispose of any real or personal property that may be necessary, convenient or incidental to the accomplishment of the purposes of the Company;

28

(c)    subject to Section 7.09(u), to enter into, perform, renegotiate, extend, amend, modify, terminate and carry out contracts of any kind, including contracts with any Member or any Affiliate thereof, or any agent of the Company necessary to, in connection with, convenient to, or incidental to the accomplishment of the purposes of the Company;

(d)    to defend and participate in administrative or other proceedings, in its name;

(e)    to borrow money and issue evidences of indebtedness, and to secure the same by a mortgage, pledge or other lien on the assets of the Company;

(f)    to set aside funds for reasonable reserves, reasonable anticipated contingencies and reasonable working capital;

(g)    to perform all treasury functions, investment of funds and cash management of the Company;

(h)    subject to Article IX, to indemnify any Person in accordance with the Act and to obtain any and all types of insurance;

(i)    to enter into and file any and all documents or instruments necessary, convenient, advisable or incidental to the accomplishment of the purposes of the Company; and

(j)    to take all actions that may be necessary or appropriate for the continuation of the Company's valid existence as a limited liability company under the Act and in each jurisdiction in which such action is necessary to protect the limited liability of the Members or to enable the Company to conduct its Business.

Section 7.09    Matters Requiring Unanimous Consent of the Board. Notwithstanding the provisions of Section 7.06 and Section 7.08, for so long as each Member (together with its Permitted Transferee Affiliates) holds a Percentage Interest of at least 33.33%, the Company shall not, and shall not permit any of its Subsidiaries to, engage in or cause any of the following actions, and neither the Board nor any committee thereof shall permit or cause the Company, or any of its Subsidiaries, to engage in, take or cause any such action except with the unanimous approval of the Board (the following enumerated actions being referred to as the "Significant Matters"), it being acknowledged and agreed that effective as of the time that any Member shall cease to hold a Percentage Interest of at least 33.33%, the provisions of this Section 7.09 shall no longer apply:

(a)    any merger, consolidation, amalgamation, recapitalization or other form of business combination involving the Company or any Subsidiary thereof;

(b)    any sale, transfer, license or sublicense of any line of business, assets or property of the Company to any Person, including any license or sublicense of Contributed IP, the Blue Cal Background Licensed IP  or the Blue Cal Future Licensed IP,

respectively, other than, subject to <u>Section 8.12</u>, the sale of inventory and products in the ordinary course of business;

(c)        any Bankruptcy Proceeding with respect to the Company or any Subsidiary thereof;

(d)        except as set forth in <u>Section 13.01</u>, any adoption of any plan or agreement of complete or partial liquidation, dissolution, restructuring or other material reorganization of the Company or any Subsidiary thereof;

(e)        any Initial Public Offering of the equity securities of the Company or any Subsidiary thereof or other registration of any such equity securities under the Securities Act of 1933 or the granting of any registration rights with respect thereto;

(f)        any amendment or modification of the Certificate or this Agreement;

(g)        the formation or organization of any Subsidiary or any Transfer of equity securities that would result in any such Subsidiary no longer being wholly-owned by the Company;

(h)        any reconstitution or reincorporation of the Company or any Subsidiary thereof;

(i)        any change to the name of the Company or the location of its principal executive office;

(j)        any change to the size of the Board;

(k)        the establishment of any committee of the Board and the removal or replacement of any member of any committee of the Board;

(l)        the engagement of the Independent IP Counsel and any change to or removal or replacement of the Independent IP Counsel;

(m)        any waiver of any conditions to Transfer set forth in <u>Section 8.03</u>;

(n)        any commencement, compromise or settlement of or withdrawal from any suit, action or legal, administrative or arbitral proceeding (including any proceeding seeking injunctive relief or criminal proceedings);

(o)        approval of each Annual Budget;

(p)        approval of any capital expenditures, capital additions, capital improvements or other similar commitments in excess of $500,000 in the aggregate, in any year to the extent not included in the Annual Budget for such year;

DOC#: US1:9013784V29

(q)        entry into, commencement of or expansion into any business outside of the business of developing, manufacturing, marketing and/or selling Company Products;

(r)        any acquisition of, or investment in, or the liquidation of any investment in, any other Person (other than assets acquired in the ordinary course of business), including, any minority investment, strategic partnership or joint venture arrangement by the Company or any Subsidiary thereof;

(s)        entry into any leasing, licensing or similar agreement pursuant to which the Company (or any Subsidiary thereof);

(t)        to the extent not included in the Annual Budget for such year, entry into, termination or suspension of any business projects;

(u)        entry (or any subsequent amendment, waiver or other modification) by the Company (or any Subsidiary thereof) into any agreement contract or arrangement (i) with any Member or their respective Affiliates (or any director or officer of such Member or any of its Affiliates) (a "Related-Party Transaction") except for entry into the Ancillary Agreements as contemplated hereunder, (ii) providing for payments to or liability for the Company (or any Subsidiary thereof) in an aggregate principal amount in excess of $25,000, (iii) that may restrict the ability of the Company (or any Subsidiary thereof) to compete with any Person in the Business anywhere in the world (whether pursuant to a non-competition, non-solicitation, most favored nation or other similar arrangement), (iv) with a competitor of either Givaudan or Blue Cal or any of their respective Affiliates, (v) with any governmental authority, providing for payments to or liability for the Company (or any Subsidiary thereof) in an aggregate principal amount in excess of $25,000, or (vi) involving any intellectual property rights that are material to the Company (or any Subsidiary thereof);

(v)        the authorization, issuance or sale of any Units or other equity securities, any options or other securities convertible into or exchangeable for Units or other equity securities, any determination with respect to each such series, including as to the number of units constituting such series and the designation of such series, the voting powers (if any) of the units of such series, and the preferences and relative, participating, optional or other special rights, if any, and any qualifications, limitations or restrictions thereof, of the units of such series;

(w)        the redemption or repurchase of any Units or equity securities;

(x)        approval of any Permitted Transfer made pursuant to Section 8.02(b);

(y)        any determination as to the existence and/or amount of Available Cash at any time and any distributions to Members;

(z)        the creation, incurrence, assumption or repayment of any indebtedness, including capital leases, guarantees, liens, encumbrances and other similar

31

obligations or the issuance or sale of any debt securities or rights to acquire any debt securities of the Company (or any Subsidiary thereof), in an aggregate principal amount in excess of $25,000, in each case, except to the extent set forth in the applicable Annual Budget;

(aa)     any material change in the accounting principles or practices used by the Company or any Subsidiary on the date of the agreement or any change of the Company's or any Subsidiary's independent public accountants;

(bb)     investments of cash and cash reserves in anything other than highly liquid securities with a known (or readily determinable) market value, which have a maturity date of less than three (3) months from the date acquired by the Company (or any Subsidiary thereof);

(cc)     any hiring decisions or employment arrangements (or renewal, waiver or modification of the terms of any existing employment arrangements) with respect to any employee or consultant of the Company (or any Subsidiary thereof);

(dd)     any decisions regarding the designation of any executive officers or the determination, allocation or payment of compensation or bonuses to any of the foregoing;

(ee)     adoption, amendment or waiver of any compensation or bonus plans and arrangements of the Company (or any Subsidiary thereof); or

(ff)     the entry into any agreement or other arrangement to do any of the foregoing.

Section 7.10   <u>Officers</u>.

(a)     All officers of the Company shall have such authority and perform such duties as may be provided in this Agreement or, to the extent not so provided, by resolution passed by the Board.  The Board may appoint officers of the Company, which shall include the Chief Executive Officer (who shall be the highest officer of the Company, and who shall report to the Board), a chief financial officer, a president, one or more vice presidents and a secretary or one or more assistant secretaries, and the Board shall have the right to dismiss any officers of the Company.  The Company may choose any other officers and agents as it shall deem necessary who, together with the appointed officers of the Company, shall hold their offices for such terms and shall exercise such positions and perform such duties as shall be determined by the Board, subject to the provisions of this Agreement.  Any individual may hold more than one office.  The Board may designate additional offices and assign thereto such duties as it may determine.  The initial officers of the Company shall be those Persons set forth on <u>Schedule C</u> to this Agreement.

(b)     The officers, to the extent of their powers set forth in this Agreement or as delegated to them by the Board, are agents of the Company for the purpose of the Company's business, and the actions of the officers taken in accordance with such powers shall bind the Company.

DOC#: US1:9013784V29

(c)      The secretary of the Company will generally perform all the duties usually appertaining to the office of secretary of a limited liability company.

(d)      Any Person dealing with the Company may rely upon a certificate signed by an appropriate officer as to:

(i)      the identity of any Member or officer;

(ii)      the existence or non-existence of any fact or facts which constitute a condition precedent to acts by the officer or in any other manner germane to the affairs of the Company;

(iii)      the Persons who are authorized to execute and deliver any instrument or document of, or on behalf of, the Company; or

(iv)      any act or failure to act by the Company or any other matter whatsoever involving the Company or any Member.

Section 7.11    Annual Budget.

(a)      On or prior to November 30 of each Fiscal Year, the chief executive officer of the Company (the "Chief Executive Officer") shall cause to be prepared and presented to the Board the proposed Annual Budget for the immediately succeeding Fiscal Year; provided, however, that the Annual Budget in respect of the Fiscal Year ended December 31, 2014 shall be agreed to by the Board (the "Initial Budget") and such Initial Budget as agreed upon by the Board shall be deemed to have been approved for all purposes of this Section 7.11.  The proposed Annual Budget for all Fiscal Years shall set forth the annual operating and capital budget of the Company on a quarterly basis.

(b)      For a period of thirty (30) days following the date on which the proposed Annual Budget is presented to the Board, the Board shall review such Annual Budget and shall make such modifications to such proposed Annual Budget as are mutually desirable and agreeable.  If the Board does not approve any proposed modifications to an Annual Budget as initially proposed by the Chief Executive Officer (including after applying the dispute resolution procedures set forth in Section 14.08), then such Annual Budget as initially proposed shall continue in effect with respect to the applicable Fiscal Year until the earlier of (i) such time as any modifications hereto are approved by the Board and (ii) the end of such Fiscal Year.  If the Board determines that the Annual Budget proposed by the Chief Executive Officer in respect of any Fiscal Year should be rejected, then the Company shall continue to be operated in accordance with the then most recently approved Annual Budget with respect to all matters delineated therein.

Section 7.12    Actions of Subsidiaries.  The Company shall not permit any Subsidiary of the Company to take any action that (i) if taken by the Company, would require the approval of the Board or a Member, or (ii) would require the approval of the board of directors or other governing body or person of such Subsidiary, unless such action by such

DOC#: US1:9013784V29

Subsidiary has been approved by the Board or such Member in accordance with the terms of this Agreement.

Section 7.13   Insurance Matters.  Subject to the provisions of Section 9.04 below, the Board shall approve, in connection with the Annual Budget, the amount and type of insurance to be carried by the Company including property, general liability, product liability and workers' compensation insurance.

Section 7.14   Intellectual Property Counsel.  Subject to Section 7.09, the Board shall cause the Company to engage independent outside counsel from a law firm selected by the IP Committee for the purpose of providing legal advice and guidance on matters relating to Company Developed IP, the Blue Cal Contributed IP and the Givaudan Contributed IP (the "Independent IP Counsel").



DOC#: US1:9013784V29















DOC#: US1:9013784V29



## ARTICLE IX

### Limitation on Liability and Indemnification

Section 9.01   <u>Limitation on Liability</u>.

(a)        No Covered Person shall be liable to the Company or to any Member for any act or omission performed or omitted by such Covered Person pursuant to authority granted to such Covered Person by this Agreement and, with respect to Officers only, performed or omitted by such Officer with a good faith belief that such act or omission was in, or not opposed to, the best interests of the Company; <u>provided</u>, that, except as otherwise provided herein, such limitation of liability shall not apply to the extent the act or

omission was attributable to such Covered Person's gross negligence, willful misconduct, fraud or knowing violation of law or this Agreement.  No Member shall be liable to the Company or any other Member for any action taken by any other Member.  To the extent that, at law or in equity, a Covered Person has duties (including fiduciary duties) and liabilities relating thereto to the Company or to the Members, any Covered Person acting under this Agreement or otherwise shall not be liable to the Company or any Member for its good faith reliance on the provisions of this Agreement.  Each of the Members and the Company hereby waives any and all fiduciary duties that, absent such waiver, may be implied or imposed by applicable law, and in doing so, acknowledges and agrees that the duties and obligations of each Covered Person to each other and to the Company are only as expressly set forth in this Agreement.  The provisions of this Agreement, to the extent they expressly restrict the duties and liabilities of a Covered Person otherwise existing at law or in equity, are agreed by the Members to modify such other duties and liabilities of such Covered Person.  No Covered Person shall be personally liable to the Company or any Member for any error of judgment made in good faith by a responsible officer or officers of the Covered Person, except to the extent that such Covered Person's conduct constituted gross negligence, willful misconduct, fraud or knowing violation of law or this Agreement.  Except as otherwise provided in this Section 9.01(a), no Covered Person shall be liable to the Company or any Member for any mistake of fact or judgment by the Covered Person in conducting the affairs of the Company or otherwise acting in respect of and within the scope of this Agreement, except to the extent that such Covered Person's conduct constituted gross negligence, willful misconduct, fraud or knowing violation of law or this Agreement or any Ancillary Agreement.

(b)       Notwithstanding anything to the contrary in this Agreement, whenever in this Agreement or any other agreement contemplated hereby a Person or Persons are permitted or required to take any action or to make a decision in its or their "sole discretion" or "discretion," such Person or Persons shall be entitled to consider such interests and factors as it or they desire.

Section 9.02   Duty of Directors.  The Directors' duty of care in the discharge of their duties to the Company and the Members shall be limited to discharging their duties pursuant to this Agreement in good faith.  In discharging their duties, the Directors shall not be liable to the Company or to any Member for any mistake or error in judgment or for any act or omission believed in good faith to be within the scope of authority conferred by law or by or pursuant to this Agreement.  To the fullest extent permitted under the Act, it is expressly acknowledged and agreed that a Director shall act in the interests of the Member by whom he or she was appointed in considering matters that may come before the Board and that a Director shall have no liability to the Company or the Members for breach of the fiduciary duty of loyalty as a result of any action taken or approval given by a Director that inures to the benefit of the Member by whom he or she was appointed.

Section 9.03   Indemnification by the Company; Non-Exclusivity of Rights.

(a)       The Company shall indemnify and hold harmless a Covered Person to the fullest extent permitted under the Act, as the same now exists or may hereafter be amended, substituted or replaced (but, in the case of any such amendment, substitution or replacement only to the extent that such amendment, substitution or replacement permits the

43

Company to provide broader indemnification rights than the Company is providing immediately prior to such amendment), against all Losses reasonably incurred or suffered by such Covered Person (or one or more of such Covered Person's Affiliates) in connection with, relating to, or arising out of the business and operations of the Company; provided, that no Covered Person shall be indemnified for any Losses suffered or incurred by such Covered Person that are attributable to such Person's or any of its Affiliate's (other than the Company) or agent's gross negligence, willful misconduct, fraud or knowing violation of law or breach of this Agreement or any Ancillary Agreement; provided, further, that no Covered Person shall be indemnified for any Losses for which such Covered Person or its Affiliates is obligated to indemnify the Company pursuant to this Agreement or any of the Ancillary Agreements. Expenses, including attorneys' fees, reasonably incurred by any such indemnified Covered Person in defending a proceeding shall be paid by the Company in advance of the final disposition of such proceeding, including any appeal therefrom, upon receipt of an undertaking by or on behalf of such Covered Person to repay such amount if it shall ultimately be determined that such Covered Person is not entitled to be indemnified by the Company.  The Company shall have the right to control any proceeding for which a claim for indemnification is sought by a Covered Person if and to the extent that such claim relates to the business and operations of the Company.  The indemnification obligations of the Company contained in this Section 9.03 shall apply to a Covered Person solely in such Covered Person's capacity as such on behalf of the Company with such duties, rights and obligations as are set forth in this Agreement.

(b)     Notwithstanding anything contained herein to the contrary (including in this Section 9.03), any indemnity by the Company relating to the matters covered in this Section 9.03 shall be provided out of and to the extent of Company assets (including any applicable policies of insurance) only and no Member shall have personal liability on account thereof or shall be required to make additional Capital Contributions to help satisfy such indemnity of the Company.

(c)     The right to indemnification and the advancement and payment of expenses conferred in this Section 9.03 shall not be exclusive of any other right which a Covered Person indemnified pursuant to this Section 9.03 may have or hereafter may acquire under any law (common or statutory), provision of the Certificate or this Agreement or the Ancillary Agreements, vote of the Members or disinterested Directors or otherwise.

Section 9.04   Insurance.  The Company may purchase and maintain insurance, at its expense, to protect itself and any Person who is an indemnified Person under Section 9.03 against any Loss, whether or not the Company would have the power to indemnify such Person against such Loss under Section 9.03.

Section 9.05   Savings Clause.  If this Article IX or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the indemnifying Person shall nevertheless indemnify and hold harmless each Person entitled to be indemnified pursuant to this Article IX as to reasonable Losses paid in settlement with respect to any action, suit or proceeding, whether civil, criminal, administrative or investigative to the full

extent permitted by any applicable portion of this <u>Article IX</u> that shall not have been invalidated and to the fullest extent permitted by applicable law.

## ARTICLE X

### Books, Records, Reports, Accounts

Section 10.01 <u>Records and Accounting</u>.

(a)  The Company shall keep, or cause to be kept, appropriate books and records with respect to the Company's business, including all books and records necessary to provide any information, lists and copies of documents required to be provided pursuant to <u>Section 10.04</u> or pursuant to applicable laws.  All matters concerning (i) the determination of the relative amount of allocations and distributions among the Members pursuant to this Agreement, and (ii) accounting procedures and determinations, and other determinations not specifically and expressly provided for by any applicable terms of this Agreement, shall be determined by the Board, whose determination shall be final and conclusive absent manifest clerical error and provided such determinations are consistent with the terms of this Agreement; <u>provided</u>, <u>however</u>, that the Company shall comply with any reasonable and customary corporate governance policies requested by Givaudan or Blue Cal (including any code of ethics) so long as such policies are applicable to such Member or any of its Controlled Affiliates.

(b)  The Board shall engage a nationally recognized firm of independent certified public accountants to perform an audit of the Company's financial statements for each Fiscal Year, subject to such firm entering into a confidentiality agreement with the Company protecting against the disclosure of the Company's and the Members' confidential information, the form of which shall be reasonably satisfactory to Givaudan and Blue Cal.

(c)  Each Member (or its authorized representatives) shall have the right, upon reasonable advance notice and during normal business hours, to inspect and copy any of the books, records, documents and information of the Company.  Each Member shall also have the right to engage a firm of independent certified public accountants, at its own expense, to audit the Company's books, records and internal controls, and the Company shall cooperate with such Member and firm in connection with such audits, subject to such auditors entering into a confidentiality agreement with the Company protecting against the disclosure of the Company's and the Members' confidential information, the form of which shall be reasonably satisfactory to Givaudan and Blue Cal.

Section 10.02 <u>Member Reports</u>.

(a)  The Company shall deliver or cause to be delivered to each Member:

(i)  within forty-five (45) days after the end of each fiscal quarter, an unaudited balance sheet and an unaudited statement of income and cash flows of

45

the Company and its Subsidiaries for and as at the end of such fiscal quarter, setting forth in comparative form with respect to the corresponding fiscal quarter for the previous Fiscal Year and with respect to the Annual Budget;

(ii)     upon the request of Givaudan or Blue Cal, within ninety (90) days (or earlier as may be required to comply with securities laws applicable to such Member or its Affiliates) after the conclusion of any Fiscal Year, audited consolidated statements of income and cash flows of the Company and its Subsidiaries for such Fiscal Year, changes in each Member's equity and each Member's Capital Account balance and an audited consolidated balance sheet of the Company and its Subsidiaries as of the end of such Fiscal Year, all prepared in accordance with GAAP; and

(iii)     within ninety (90) days after the conclusion of any Fiscal Year, an unaudited statement of changes in each Member's equity and each Member's Capital Account balance for such Fiscal Year.

(b)     To the extent that a Member (the "Consolidating Member") consolidates the financial statements of the Company in accordance with GAAP, the Company shall deliver to each Member:

(i)     within ten (10) Business Days after the conclusion of each month, an unaudited reporting package which contains a balance sheet and statement of operations of the Company, prepared in accordance with GAAP, the format of which reporting packages shall be mutually determined by the Company and the Consolidating Member in good faith;

(ii)     on a timely basis in good faith, information with respect to Subsequent Events (as defined in accordance with GAAP) that may affect either accounting or disclosure matters on a periodic basis during a fiscal quarter and year-end close up through the time that the Consolidating Member files its consolidating financial statements with the U.S. Securities and Exchange Commission; and

(iii)     a representation letter on a quarterly and annual basis which provides customary representations of the Company with respect to the preparation of the financial information in the reporting packages described in clause (i) of this subsection (b) and applicable internal controls over financial reporting.

Section 10.03 Accounts.  The Board shall establish and maintain one or more separate bank and investment accounts and arrangements for Company funds in the Company's name with financial institutions and firms that the Board determines.  The Board may not commingle the Company's funds with the funds of any Member.

Section 10.04 Other Information.  In addition to the other rights specifically set forth in this Agreement, each Member shall be entitled to all information to which such Member is entitled to have access pursuant to Section 18-305(a) of the Act under the circumstances and subject to the conditions therein stated.

## ARTICLE XI

### Other Opportunities

Section 11.01 <u>Other Opportunities</u>.  Subject to compliance with the other provisions of this Article XI and their other commitments under this Agreement and the Ancillary Agreements:

(a)  any Director (other than the CEO Director) or Member or its Affiliate (other than the Company and its Subsidiaries) may conduct any business or activity whatsoever outside of the Company without any accountability to the Company or any other Member (and all revenue and expenses attributable to any such business or activity shall be for the sole account of the Director or Member or its Affiliate (other than the Company and its Subsidiaries) performing such business and activity) regardless of whether (i) such outside business or activity of such Director or Member or such Affiliate competes with the business of the Company, (ii) such outside business or activity by such Director or Member or such Affiliate is or is not in the best interests of the Company or the other Members (unless such business or activity is performed on behalf of the Company), or (iii) such Director or Member or such Affiliate became aware of such outside business or activity in her or his role with the Company or as a Member (including through its appointed Directors), as applicable, and this Agreement shall not give the Company, any Member or other Person any interest in, or right to, any such outside business or activity or any proceeds, income or profit thereof or therefrom;

(b)  the Company and the Members hereby acknowledge that the conduct (or the omission of conduct) of any business or activity outside of the Company shall not:  (i) constitute a breach of this Agreement; (ii) constitute a breach of any fiduciary or other duty owed to the Company or any Member; or (iii) otherwise give rise to any liability to the Company or any Member; and

(c)  no Director (other than the CEO Director) or Member shall be obligated hereunder to offer any business opportunity to the Company or any other Member or be restricted from pursuing any business opportunity offered to the Company.

## ARTICLE XII

### Confidentiality

Section 12.01 <u>Confidentiality</u>.

(a)  Each of the Members acknowledges that, from time to time, it and its Affiliates may receive information from or regarding the other Member (or its Affiliates) or the Company in the nature of trade secrets or that otherwise is confidential, including the terms of this Agreement and any Company Products ("<u>Confidential Information</u>"), the release or disclosure of which could be damaging to the other Member (or its Affiliates), the Company or Persons with which it does business.

DOC#: US1:9013784V29

(b)       Each of the Members and the Company receiving any Confidential Information (each, a "Receiving Party") shall hold in strict confidence any Confidential Information it receives with the same degree of care as it uses to avoid unauthorized use, disclosure, publication or dissemination of its own confidential information of a similar nature, but in no event less than a reasonable degree of care; provided, that a Receiving Party may disclose such Confidential Information to any Affiliate, Covered Person or professional advisor of such Receiving Party that agrees to abide by the restrictions in this Section 12.01; provided, further, that a Receiving Party may disclose such Confidential Information to the extent required by any legal, accounting or regulatory requirements (including the requirements of any securities exchange) or in connection with enforcing its rights under this Agreement or the Ancillary Agreements; and provided, further, that the Receiving Party disclosing such Confidential Information shall be responsible for any breaches of confidentiality by any such Affiliate, Covered Person or professional advisor of such Receiving Party.  For the avoidance of doubt, the restrictions in this Section 12.01(b) shall continue to apply to a Member after it has ceased to be a Member.

(c)       The restrictions in this Section 12.01 shall not apply to any Confidential Information to which the Receiving Party can demonstrate that such Confidential Information:  (i) is or became public knowledge through no action of such Receiving Party or its Affiliates, officers, directors, representatives or agents in violation of this Agreement; (ii) has been provided to such Receiving Party without restriction by an independent third party who has not, directly or indirectly, received such Confidential Information from such Receiving Party (or the Company); (iii) was properly in the possession of such Receiving Party prior to the time of receipt of such Confidential Information; (iv) is required to be disclosed by law, regulation or court order (provided, that such Receiving Party shall notify the Board promptly of any request for that Confidential Information, before disclosing it if practicable); (v) was developed independently by such Receiving Party in the course of work by employees or other agents of such Receiving Party without use of such Confidential Information; or (vi) has been provided to such Receiving Party independently of such Receiving Party's activities with respect to the Company.

## ARTICLE XIII

## Termination, Dissolution and Liquidation

Section 13.01 Dissolution.  Notwithstanding anything to the contrary contained herein, the Company shall be dissolved and its affairs wound up upon the first to occur of any of the following events:

(a)       the consent of the Board pursuant to Section 7.06 or Section 7.09, as applicable;

(b)       the entry of a decree of judicial dissolution under Section 18-802 of the Act;

(c)       a Bankruptcy Event with respect to the Company;

(d)         any Bankruptcy Event or Change of Control of a Member, its Controlling Affiliates or any other Affiliate that is a party to any Ancillary Agreement (such Member, the "Affected Member"), if the other Member (the "Non-Affected Member"), shall have delivered written notice of its election to terminate this Agreement at any time within sixty (60) days after becoming aware of such Bankruptcy Event or Change of Control, as applicable;

(e)         at the election of any Member upon written notice to the other Members within thirty (30) days after the failure of the Resolution Representatives to resolve a dispute in respect of a Significant Matter within the period set forth in Section 14.08; or

(f)         at the election of a non-breaching Member, if there has been a Material Breach of the Agreement by the other Member, which breach is not waived by non-breaching Member or cured by the breaching Member within sixty (60) days after receipt by breaching Member of written notice thereof from the non-breaching Member; provided, that the Member seeking to dissolve the Company pursuant to this Section 13.01(f) is not then in Material Breach of its obligations under this Agreement.

Section 13.02  Winding Up.  Upon the dissolution of the Company as provided in Section 13.01, the business and affairs of the Company shall be wound up by a liquidating trustee (a "Liquidator") chosen by the mutual agreement of Givaudan and Blue Cal.  In performing its duties, the Liquidator is authorized to sell, assign, encumber or otherwise dispose of any or all of the assets of the Company and to wind up and liquidate the affairs of the Company in an orderly and business-like manner; provided, however, that, except as required under applicable law in order to satisfy any liabilities of the Company or its Subsidiaries to any creditors, the Liquidator shall not sell, distribute, exchange or otherwise dispose of the Contributed IP, Blue Cal Contributed IP, the Givaudan Contributed IP, the Blue Cal Background Licensed IP or ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ except in accordance with the provisions of Section 13.03 and Section 13.06 below.  The Liquidator shall cause to be prepared and distributed to the Members a statement of the assets and liabilities of the Company (on a consolidated basis) as of the date of dissolution.



DOC#: US1:9013784V29



Section 13.04 <u>Survival of Liabilities and Obligations</u>.  The dissolution or winding up of the Company for any reason shall not release any Member from any liability or obligation which at the time of such dissolution or winding up already had accrued to any other Member or which thereafter may accrue in respect of any act or omission prior to such dissolution or winding up.

Section 13.05 <u>Claims of the Members</u>.  Members shall look solely to the assets or the Company for the return of their Capital Contributions, and if the assets of the Company remaining after payment of or due provision for all debts, liabilities and obligations of the Company are insufficient to return such Capital Contributions, the Members shall have no recourse against the Company or any other Member or any of their respective Affiliates with respect to the return of their Capital Contributions.

Section 13.06 <u>Distributions in Kind</u>.  In the case of distributions of securities or other property, such securities or other property shall, for purposes of <u>Section 13.03</u>, be valued at Fair Market Value as reasonably determined by the Liquidator.



DOC#: US1:9013784V29



52



Section 13.08 <u>Cancellation of Certificate</u>.  Upon the completion of the winding up of the Company's affairs and distribution of the Company's assets, the Company shall be terminated and the Members shall cause the Company to execute and file a certificate of cancellation in accordance with Section 18-203 of the Act.

## ARTICLE XIV

## General Provisions

Section 14.01 <u>Amendment or Modification</u>.  This Agreement may be amended or modified only by written agreement of all of the Members.

Section 14.02 <u>Notices</u>.  Except as may otherwise be expressly set forth in this Agreement, the terms notice, notify and the like when used herein shall mean written notice

DOC#: US1:9013784V29

(including facsimile or similar writing or electronic mail) and shall be sufficiently given if given to a party at such party's address or facsimile number or electronic mail address as set forth in Schedule A attached hereto, or such other address or facsimile number or electronic mail address as such party may hereafter specify to the Company and the other Members or parties for such purpose.  Each such notice or other communication shall be effective:

        (a)      if given by facsimile, when such facsimile is transmitted to the facsimile number specified above and the appropriate confirmation is received;

        (b)      if given by electronic mail, when such electronic mail is transmitted to the electronic mail address specified above and the recipient confirms receipt by reply electronic mail;

        (c)      if given by mail, three (3) Business Days after such communication is mailed by registered or certified mail postage prepaid, addressed as aforesaid;

        (d)      if given by reputable national overnight courier, on the date of delivery as reflected in the records of such courier; or

        (e)      if given by any other means, when delivered personally to the party or when delivered at the address specified above.  Whenever any notice is required to be given by law or this Agreement, a written waiver thereof, signed by the person entitled to notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice.

        Section 14.03 Public Announcements.  All media releases, public announcements and public disclosures by any party relating to this Agreement or the subject matter of this Agreement (including promotional or marketing materials) shall be coordinated with and subject to the approval of Givaudan and Blue Cal prior to release, other than any announcement intended solely for internal distribution within such party's organization or any disclosure required by legal, accounting or regulatory requirements (including the requirements of any securities exchange).

        Section 14.04 Enforcement of Company's Rights.  Notwithstanding anything to the contrary elsewhere in this Agreement or the Ancillary Agreements, without any consent or approval of the Board, (i) Blue Cal shall have the right to cause the Company to exercise the Company's rights (including all rights to access and information) and enforce the Company's remedies with respect to any and all Related-Party Transactions between the Company, on the one hand, and Givaudan or any of its Affiliates, on the other hand, including pursuant to this Agreement and the Ancillary Agreements, and (ii) Givaudan shall have the right to cause the Company to exercise the Company's rights (including all rights to access and information) and enforce the Company's remedies with respect to any and all Related-Party Transactions between the Company, on the one hand, and Blue Cal or any of its Affiliates, on the other hand, including pursuant to this Agreement and the Ancillary Agreements; provided, however, that if a Member alleges that any other Member or their respective Affiliates has breached the terms of any such Related-Party Transactions, the alleging Member shall pay all legal fees and

expenses reasonably incurred in connection with the Company's enforcement of its rights and remedies with respect to such alleged breaches under the terms of such Related-Party Transactions (except to the extent that the payment of such fees and expenses are otherwise allocated pursuant to the express terms of such agreement) in the event that the matter proceeds to a final judgment not subject to appeal pursuant to which the Company does not prevail in whole or in part in proving any such breach.  If either Member makes a claim that the Company has breached any of its obligations in connection with a Related-Party Transaction between the Company and such Member, the other Member shall have the right to cause the Company to defend such claim.

Section 14.05 <u>Entire Agreement</u>.  This Agreement and the schedules and exhibits attached hereto, together with the Ancillary Agreements, embody the entire understanding and agreement among the parties and supersede any prior understanding and agreement by or among the parties, written or oral, relating to the subject matter hereof.

Section 14.06 <u>Waiver</u>.  No failure or delay on the part of any party hereto in exercising any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power or remedy preclude any other or further exercise thereof or the exercise of any other right, power or remedy.  The remedies provided for herein are cumulative and are not exclusive of any remedy that may be available to the parties hereto at law, in equity or otherwise.

Section 14.07 <u>Injunctive and Other Relief</u>.  Each party acknowledges and agrees on behalf of itself and its Affiliates that the rights afforded herein are unique and that any violation of this Agreement or any Ancillary Agreement may cause irreparable injury to the Company or non-breaching party for which monetary damages are inadequate, difficult to compute, or both.  Accordingly, each party expressly agrees that, in addition to any other remedies which the Company or non-breaching party may have, the Company and non-breaching party shall be entitled to injunctive or other equitable relief for any breach or threatened breach of any term, provision or covenant of this Agreement or any Ancillary Agreement by the breaching party.  Nothing contained herein shall prevent or delay the Company or non-breaching party from seeking specific performance or other equitable remedies in the event of any breach or intended breach by any party of such party's obligations hereunder or any Ancillary Agreement.  In addition, the non-breaching party may bring an action on their own or on behalf of the Company against the breaching parties with respect to any breach or bring any action as may be permitted to recover damages on behalf of the Company or the non-breaching party.  In any such proceeding or action, the prevailing party or parties shall be entitled to receive from the non-prevailing party or parties, in addition to such other damages and relief as may be awarded, the costs and expenses incurred by it or them in connection with such action, including reasonable attorneys' fees.

Section 14.08 <u>Dispute Resolution</u>.  In the event of any dispute between the parties, including with respect to the approval of any Significant Matters, the parties shall work together in good faith to resolve such dispute for such time as may be specified under the terms of this Agreement or as otherwise agreed by the involved parties or, if no time limit is provided under this Agreement and the involved parties cannot otherwise agree, then for thirty (30) days from the date of written notice by either party first describing the applicable

DOC#: US1:9013784V29

dispute.  If the parties are unable to resolve such dispute within the applicable period, a senior executive officer or each party as may be designated by each party from time to time (or an authorized representative thereof) (each such designee, a "Resolution Representative") shall meet, confer and discuss in person or by telephone conference in an attempt to resolve the dispute or deadlocked matter in good faith.  If the Resolution Representatives of the involved parties are unable to resolve such dispute within thirty (30) days following referral of such dispute pursuant to this Section 14.08, then such dispute (i) in the case of any dispute other than a dispute relating to a Significant Matter, be resolved in accordance with Section 14.10 below and (ii) in the case of any dispute relating to a Significant Matter, any Member shall have the right to elect to cause the Company to be dissolved in accordance with Section 13.01(e).

Section 14.09 Binding Effect.  Subject to the restrictions on Transfers set forth in Article VIII, this Agreement shall be binding on and inure to the benefit of the Members and their respective heirs, legal representatives, successors and assigns.

Section 14.10 Governing Law; Waiver of Jury.  This Agreement and all claims and causes of action (whether in contract, tort or otherwise) shall be governed by and shall be construed in accordance with the laws of the State of Delaware, excluding any conflict-of-laws rule or principle that might refer the governance or the construction of this Agreement to the law of another jurisdiction.  EACH OF THE PARTIES HERETO HEREBY AGREES TO WAIVE ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.  THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS AGREEMENT, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS.  EACH PARTY HERETO FURTHER REPRESENTS AND WARRANTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.

Section 14.11 Consent to Jurisdiction and Service of Process.  Subject to Section 14.08, any legal action, suit or proceeding arising out of or relating to this Agreement, or the breach, termination or validity thereof, shall be instituted in any state or federal court in the State of New York located in the County of New York.  Each Party agrees not to assert, by way of motion, as a defense or otherwise, in any such action, suit or proceeding, any claim that it is not subject personally to the jurisdiction of such courts, that its property is exempt or immune from attachment or execution, that the action, suit or proceeding is brought in an inconvenient forum, that the venue of the action, suit or proceeding is improper or that this Agreement, the agreements contemplated hereby or the subject matter hereof or thereof may not be enforced in or by such court.  Each Party further irrevocably submits to the exclusive jurisdiction of any such court in any such action, suit or proceeding.   Any and all service of process and any other notice in any such action, suit or proceeding shall be effective against any Party if given by registered or certified mail, return receipt requested, or by any other

means of mail that requires a signed receipt, postage prepaid, mailed to such Party as herein provided.

Section 14.12 <u>Severability</u>.  If any provision of this Agreement or the application thereof to any Person or circumstance is held invalid or unenforceable to any extent, the remainder of this Agreement and the application of that provision to other Persons or circumstances shall not be affected thereby and that provision shall be enforced to the greatest extent permitted by law.

Section 14.13 <u>Further Assurances</u>.  In connection with this Agreement and the transactions contemplated hereby, each Member and the Company shall execute and deliver any additional documents and instruments and perform any additional acts that may be necessary or appropriate to effectuate and perform the provisions of this Agreement and those transactions.

Section 14.14 <u>No Third-Party Beneficiaries</u>.  The provisions hereof are solely for the benefit of the Company, its Members and, to the extent specifically set forth herein, the Directors, officers and Covered Persons, and are not intended to, and shall not be construed to, confer a right or benefit on any creditor (in its capacity as such) of the Company or any other Person.

Section 14.15 <u>Waiver of Certain Rights</u>.  Each Member irrevocably waives any right it may have to maintain any action for dissolution of the Company or for partition of the property of the Company, other than pursuant to <u>Article XIII</u>.

Section 14.16 <u>Opt-out of Article 8 of the Uniform Commercial Code</u>.  The Members hereby agree that the Common Units shall not be securities governed by Article 8 of the Uniform Commercial Code of the State of Delaware (and the Uniform Commercial Code of any other applicable jurisdiction).

Section 14.17 <u>Delivery by Facsimile</u>.  This Agreement and any signed agreement or instrument entered into in connection with this Agreement or contemplated hereby, and any amendments hereto or thereto, to the extent signed and delivered by means of a facsimile machine or facsimile delivered by electronic mail (a "<u>pdf file</u>"), shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.  At the request of any party hereto or to any such agreement or instrument, and without affecting the effectiveness of any previous execution thereof by facsimile or pdf file, each other party hereto or thereto shall re-execute original forms thereof and deliver them to all other parties.  No party hereto or to any such agreement or instrument shall raise the use of a facsimile machine or pdf file to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine or pdf file as a defense to the formation of a contract and each such party forever waives any such defense.

DOC#: US1:9013784V29

Section 14.18 <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts with the same effect as if all signing parties had signed the same document.  All counterparts shall be construed together and constitute the same instrument.

Section 14.19 <u>No Presumption</u>.  With regard to each and every term and condition of this Agreement and any and all agreements and instruments subject to the terms hereof (including the Ancillary Agreements), the parties hereto understand and agree that the same have or has been mutually negotiated, prepared and drafted, and if at any time the parties hereto desire or are required to interpret or construe any such term or condition or any agreement or instrument subject hereto (including the Ancillary Agreements), no consideration will be given to the issue of which party hereto actually prepared, drafted or requested any term or condition of this Agreement or any agreement or instrument subject hereto (including the Ancillary Agreements).

Section 14.20 <u>Expenses</u>.  Each Member shall bear all of its own expenses incurred in connection with the preparation, execution and performance of this Agreement, the Ancillary Agreements and any amendments, modifications or supplements thereto, except where expressly provided herein or approved by the Board.

Section 14.21 <u>Headings</u>.  The section and other headings contained in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

{signature page follows}

DOC#: US1:9013784V29

IN WITNESS WHEREOF, the Members and the Company have executed this Agreement as of the date first above written.

GIVAUDAN SA

By:

Name:

Title: Roberto Garavagno
Deputy Group Counsel

Matthias Wiehen
CFO

PHYTO TECH CORP. d/b/a BLUE CALIFORNIA

By:

Name: steven chen

Title: President and CEO

BGN TECH LLC

By:

Name: steven chen

Title: CEO

DOC#: US1:9013784V29





3



4

SCHEDULE E

BLUE CAL INITIAL CONTRIBUTED IP



## SCHEDULE F



DOC#: US1:9013784V29

SCHEDULE G

BLUE CAL BACKGROUND LICENSED IP



DOC#: US1:9013784V29

Schedule H

BLUE CAL FUTURE LICENSED IP





2

# FIRST AMENDMENTTO THE LIMITED LIABILITY COMPANY AGREEMENT
## OF
## BGN TECH LLC

THIS FIRST AMENDMENT TO THE LIMITED LIABILITY COMPANY AGREEMENT OF BGN TECH LLC (this "Amendment"), is made as of 3 September, 2014 by Givaudan SA, a company existing under the laws of Switzerland ("Givaudan") and Phyto Tech Corp. d/b/a Blue California, a California corporation ("Blue Cal," together with Givaudan, the "Members"), as the members of BGN Tech LLC, a Delaware limited liability company (the "Company").

## RECITALS

WHEREAS, the Members entered into that certain Limited Liability Company Agreement of the Company, dated as of February 21, 2014 (as amended, restated, or supplemented from time to time, the "Agreement"), in respect of the Company; and

WHEREAS, the Members desire to amend the Agreement as provided in this Amendment.

NOW, THEREFORE, in consideration of the promises contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Members agree as follows:

1.    Amendment.  The Agreement is hereby amended as follows:

(a)    Schedule D-1 of the Agreement is hereby deleted and replaced in its entirety with the Schedule D-1 attached hereto as Exhibit A.

(b)    Schedule D-2 of the Agreement is hereby deleted and replaced in its entirety with the Schedule D-2 attached hereto as Exhibit B.

2.    Effect on the LLC Agreement.  This Amendment shall not constitute a waiver, amendment or modification of any provision of the Agreement not expressly referred to herein.  Except as expressly amended or modified herein, the provisions of the Agreement are and shall remain in full force and effect and are hereby ratified and confirmed.  On and after the date hereof, each reference in the Agreement to "this Agreement," "herein," "hereof," "hereunder" or words of similar import shall mean and be a reference to the Agreement as amended hereby.  To the extent that a provision of this Amendment conflicts with or differs from a provision of the Agreement, such provision of this Amendment shall prevail and govern for all purposes and in all respects.

3.    General Provisions.  Subject to Section 2 hereof, Article XVI of the Agreement is incorporated herein by reference, *mutatis mutandis*, as if set forth in full herein.

*Signature page follows*

IN WITNESS WHEREOF, the Members have executed this Amendment as of the day and year first above written.

MEMBERS:

GIVAUDAN SA

By: _____

Name: Roberto Garavagno
Title: Deputy Group Counsel

R. Zellweger
R. ZELLWEGER
Legal Counsel

PHYTO TECH CORP. d/b/a BLUE CALIFORNIA

By: _____

Name: STEVEN CHEN
Title: CEO

[Signature Page to First Amendment to the Limited Liability Company Agreement of BGN Tech LLC]





# SECOND AMENDMENT TO THE LIMITED LIABILITY COMPANY AGREEMENT
## OF
## BGN TECH LLC

THIS SECOND AMENDMENT TO THE LIMITED LIABILITY COMPANY AGREEMENT OF BGN TECH LLC (this "Amendment"), is made as of [•], 2015 by Givaudan SA, a company existing under the laws of Switzerland ("Givaudan") and Phyto Tech Corp. d/b/a Blue California, a California corporation ("Blue Cal," together with Givaudan, the "Members"), as the members of BGN TECH LLC, a Delaware limited liability company (the "Company").

## RECITALS

WHEREAS, the Members entered into that certain Limited Liability Company Agreement of the Company, dated as of February 21, 2014 (as amended, restated, or supplemented from time to time, the "Agreement"), in respect of the Company; and

WHEREAS, the Members desire to amend the Agreement as provided in this Amendment.

NOW, THEREFORE, in consideration of the promises contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Members agree as follows:

1.   Amendment.  The Agreement is hereby amended as follows:

Schedule D-2 of the Agreement is hereby deleted and replaced in its entirety with the Schedule D-2 attached hereto as Exhibit A.

2.   Effect on the LLC Agreement.  This Amendment shall not constitute a waiver, amendment or modification of any provision of the Agreement not expressly referred to herein.  Except as expressly amended or modified herein, the provisions of the Agreement are and shall remain in full force and effect and are hereby ratified and confirmed.  On and after the date hereof, each reference in the Agreement to "this Agreement," "herein," "hereof," "hereunder" or words of similar import shall mean and be a reference to the Agreement as amended hereby.  To the extent that a provision of this Amendment conflicts with or differs from a provision of the Agreement, such provision of this Amendment shall prevail and govern for all purposes and in all respects.

3.   General Provisions.  Subject to Section 2 hereof, Article XIV of the Agreement is incorporated herein by reference, *mutatis mutandis*, as if set forth in full herein.

*Signature page follows*

IN WITNESS WHEREOF, the Members have executed this Amendment as of the day and year first above written.

MEMBERS:

GIVAUDAN SA

By: _____

Name: Roberto Garavagno      Virginie Waeber
Title: Deputy Group Counsel     Legal Counsel

PHYTO TECH CORP. d/b/a BLUE CALIFORNIA

By: _____
Name: STEVEN CHEN
Title: president

